JAMES NEWELL, Plaintiff in Error, *v*. ROBERT C. COWAN and WIFE, Defendants in Error.

1. MASTER: WHEN LIABLE FOR TORTS OF HIS SLAVE.—A master may order his slaves to arrest another slave illegally on his plantation, without being himself, or having any other white person present, and without thereby being made responsible for any tort committed by his slaves, in making the arrest.

2. SAME.—It is well settled law, in the slave states of the Union, that the master is not responsible for a trespass, or *tort* committed by his slaves, unless it was done in pursuance of his orders, or was the result of improper conduct on his part, or occasioned by his failure to exercise his legal authority over them; but this exemption does not allow him to stimulate or encourage them in the commission of a wrong.

3. ACTION FOR A FELONY: MAY BE MAINTAINED BEFORE CONVICTION.—In this state, a party injured by the felonious conduct of another, may maintain his action for the injury, previous to and without a conviction of the felon in a criminal proceeding.

IN error to the Circuit Court of Harrison county. Hon. John E. M'Nair, judge.

Robert C. Cowan and wife, sued James Newell, in trespass, under the New Pleadings Act, to recover damages for the loss of a slave, belonging to Mrs. Cowan, and which they alleged had been drowned, by the illegal act of defendant's slaves, in endeavoring to arrest him, in obedience to defendant's orders. Defendant pleaded, first, the general issue; and second, that he had not been prosecuted and convicted criminally of the felony complained of in said supposed trespass. Plaintiff demurred to the said second plea, and had judgment thereon, sustaining his demurrer. Trial was then had on the complaint and general issue, and verdict and

judgment were rendered for the plaintiff for $1200. Defendant moved for a new trial, which was overruled, to which he filed his bill of exceptions, from which it appears, that on the trial, plaintiff proved to the jury by W. D. Marten, that on the day their slave Florence was drowned, he saw a number of negroes pursuing him, with much noise, toward the bayou Bernard, in Harrison county; that all were running, the boy Florence being ahead. That Florence jumped in the bayou, and swam as if intending to cross it. That the slaves on shore, to the number of eight or nine, with noise and excitement, threw brickbats after said boy Florence, which .fell near around him, but that he saw none strike him. That the brickbats were thrown by two of defendant's slaves; that before the boy Florence reached the opposite shore, he sunk and was drowned.

William Cowherd, testified that in 1853, he met with defendant at a blacksmith's shop, where he proceeded to tell witness how the affair happened. That he complained of plaintiff for having his, defendant's negroes, put and kept in jail, for the acccidental drowning of the slave Florence, and said that the boy Florence had come to his quarter on Sunday, and got into a quarrel and fuss with his negroes, and that he had told his slaves to tie plaintiff's slave, and bring him to him the defendant, but that the negro was drowned in the bayou. That the defendant then told the witness a long story about witchcraft, of which he now recollected nothing.

William Watson, testified that we went from Mr. Hurlbert's to Newell's, with defendant, and that on the way defendant abused Cowan for having put his negroes in jail, and said the negroes ought not to suffer, as they were not to blame; because said defendant told him that when the quarrel took place among the negroes, at defendant's quarter, he ordered his slaves to take and tie the plaintiff's slave, Florence, and bring him to him or kill him. That witness talked but a few minutes with defendant, and this was all he said.

Donald M'Bean, testified that the defendant, soon after the affair happened, told him that he ordered his slaves, on the occasion of the fuss at the quarter, to bring plaintiff's slave to him,

and said he intended to have him tied and sent home to the plaintiff, his master.

The title to the slave Florence, was proven to be in Mrs. Cowan, and his value at the time of his death, $1200.

James Overstreet, for defendant, testified that at the time of the fracas at defendant's quarter, and the drowning of Florence, he was staying at defendant's house, who was his grandfather. That the defendant has been a cripple, and walked on his crutches, for years past. On that day he was with defendant or about the house, all the time until after the drowning of Florence. That the defendant was confined to his room by sickness, and most of the day to his bed. Sometime in the afternoon a woman slave of defendant came to him, and in presence of witness told him that Florence was at the quarter and was making a fuss or quarrel; the defendant then told the woman to tell his slaves to bring the slave Florence to him. That the woman left with the order, and soon returned with the report that all the slaves had left the quarter; and soon afterwards witness was requested by defendant to go over to plaintiff's house, and inform him about the difficulty which had arisen among the slaves, when witness learned from plaintiff's brother, that the slave Florence had been drowned. Witness stated he was positive that no other order was given by defendant to his slaves, than the message sent by the woman before alluded to. That the defendant's standing orders to his slaves were, that when any disturbance was caused on his place by other slaves, "to bring such slaves to him." That he was positive no order was given by defendant in this case to his slaves, to tie the boy Florence and bring him to defendant, or kill him. That he heard the order given to the woman, and must necessarily have heard any other order if it had been given.

Witness on cross-examination, stated that he was not certain he was in the house all day, but was about it until after the difficulty. The defendant might possibly have given the order spoken of by witness Watson, without his hearing it.

This is all the evidence and proceedings in the court below, necessary to set out, under the opinion of the court.

*John Henderson,* for plaintiff in error, argued:—

1. The demurrer to plaintiff's second plea was erroneously over-ruled. The private citizen is not permitted by law to have redress for a felony committed by another, until public justice has been first vindicated by the prosecution and conviction of the felon; and on this point he cited, 6 Com. Dig. tit. Trespass, D. 397; 1 Ib. B. 181, 182; 3 Bac. Ab. 132; 4 Munf. R. 449.

2. That it is even questionable whether suit can be maintained for damages, occasioned by killing a human being. See *Baker* v. *Balton,* 1 Camp. 493; American Railway Cases, 462.

3. That the fourth charge was improperly given. This charge interferes with, and destroys the master's police over his plantation. It is absurd to say, that in case of the sickness of the master, and the absence of other white persons from the plantation, the master cannot order his slaves to arrest marauding runaway slaves, who are on his plantation, committing depredations.

4. The court should have granted a new trial. The verdict was without evidence to support it. The testimony of Overstreet clearly shows, that defendant had no legal complicity with the drowning of Florence, and without this, he is certainly not liable. The testimony of Watson is suspicious; and being the admission of the party, and impossible to be contradicted and easily fabricated, is utterly insufficient to warrant the verdict, in opposition to the positive proof of Overstreet. Mr. Henderson argued further the evidence, and made other law points not necessary to be referred to.

*T. J.* and *F. A. R. Wharton,* for defendant in error, argued the cause elaborately on the evidence, and made the following points of law:—

1. The case was fairly submitted to the jury, and the verdict not being unsupported by the evidence, it should not be disturbed. It was peculiarly and exclusively within the province of the jury to decide,—there being conflicting evidence. They have decided to believe Watson, testifying to the statements of defendant, made in opposition to his interests, and to disbelieve Overstreet; and this court cannot now interfere. *M'Coy* v. *M'Kewan,* 26 Miss. 490. The jury believed that the death of Florence was caused by the

act of defendant's slaves, done under his orders to arrest or kill, and if his orders were so, he is undoubtedly liable.   The fact that the slaves who directly committed the felony are criminally liable, does not impair or diminish his liability.

2.  For the rule regulating the master's liability for the acts of his slave, see 7 S. & M. 354; 2 Bay, 345; Saund. Pl. & Ev. 863; 7 Yerg. 345; 2 Bouvier, Inst. 495; 4 Ib. 26, 27.

FISHER, J., delivered the opinion of the court.

The plaintiffs below brought this action in the Circuit Court of Harrison county, to recover from the defendant the value of a slave, alleged to have been killed by the slaves of the defendant, while attempting to arrest the said slave, under the orders of their master.

The jury having returned a verdict for the plaintiffs below, the counsel for the defendant moved the court for a new trial, which being refused, a bill of exceptions setting forth the evidence introduced on the trial, was taken, from which it appears, that the slave of the plaintiffs, was on a certain Sunday at the quarter of the defendant.   That learning the slave was quarrelling with defendant's slaves, he ordered them to take him, tie and bring him to the defendant.   That about this time, whether before or after the order was given, does not appear by the plaintiff's evidence, the slave left the quarter, and being closely pursued by the defendant's slaves, he jumped into a bayou, for the purpose, no doubt, of escaping from his pursuers.   That while swimming the bayou, the slaves of the defendant threw brickbats at him; though falling near him, none were seen to strike him.   That in consequence of the noise made by the defendant's slaves on the shore, the throwing of the brickbats, &c., the slave becoming alarmed, was drowned before reaching the opposite shore of the bayou; at least such is the impression intended to be produced by the evidence.   One witness says, that the defendant said he ordered his slaves to take the plaintiffs' slave or to kill him.

The evidence of the defendant, on the contrary shows, that the defendant was on the above occasion confined to his room by sickness; that a woman from the quarter on the afternoon of said

day, came to the house and told the defendant, that the plaintiffs' slave was at the quarter, and engaged in a quarrel with the defendant's slaves; that the order to take the slave was sent by the woman to the slaves at the quarter, and that the plaintiffs' slave was drowned before this order was by the woman communicated, and finally that it was one of defendant's rules to be observed by his slaves, to have all slaves coming on the plantation, except on business, arrested and brought to the defendant.

The question arising for decision upon the whole evidence is, whether it was sufficient to authorize the jury in finding a verdict for the plaintiffs.

It may now be regarded as the settled law in all of the slave states, except where otherwise provided by statute, that the master is not responsible for a *tort* or trespass committed by his slaves, unless it can be shown that they acted in obedience to some order by him given, or that the act was the result, in some way, of improper conduct on his part, or that he failed, when it was in his power, to exercise his authority over his slaves, and for want of such authority the wrong was committed. It is rather straining the point in this case to say, that the slaves acted under the special order alleged to have been given by the defendant, instead of under the general order laid down for the government of his plantation in regard to slaves coming on the same.

But before noticing the evidence, we will notice the fourth instruction given by the court to the jury at the instance of the plaintiffs' counsel, which is as follows: "That a master has no right to order his slaves to arrest other slaves when they are peaceable, in the absence of himself, or some other white person." The statute on this subject is as follows: "And if any slave shall presume to come and be upon the plantation of any person whatsoever, without leave in writing from his or her master, employer or overseer, not being sent upon lawful business, it shall be lawful for the owner or overseer of such plantation, to give or order such slave ten lashes," &c. Hutch. Code. 513, § 8. The statute clearly gives to the owner of a plantation the right to inflict chastisement upon slaves coming upon it without authority from the proper person, and the right to chastise, implies the right to make the arrest

for that purpose. So with respect to the right to order the chastisement to be inflicted ; the right to order the arrest would follow as a necessary consequence.

This instruction, therefore, cannot, under our construction of the statute, be regarded as a correct exposition of the law. It is immaterial whether the slave was peaceable or not; if he came upon the defendant's premises without a written permission, or not on business, it was the defendant's right, if he chose to exercise it, to inflict upon the slave the chastisement prescribed by the statute, and for this purpose to cause him to be arrested.

The instruction, in the first place assumes that the slave was peaceable while at the quarter, and then virtually says, if peaceable, the master could not order the slave to be arrested, unless he, the master, or some other white person were present.

It being manifest that the master was not present, the jury under the instruction, were bound to treat the order to arrest the slave in the absence of the master, as illegal, and so treating it, they could not do otherwise than find for the plaintiffs. The effect of the instruction was to cut off all consideration of the evidence, and their right to determine whether the testimony of the defendant, or that on behalf of the plaintiffs should prevail.

The testimony of the plaintiffs, if credited to the full extent, might possibly uphold the verdict, as it shows that the slaves were commanded to make the arrest or to kill the slave. It will, however, be borne in mind, that this is but an admission of the party, and may be worth but little as evidence. Such evidence may be the weakest or strongest, according to all the surrounding circumstances.

Assuming, however, that such an order was given, it would certainly be such an act of rashness, as ought to render the defendant accountable for any excesses committed by his slaves; for while as a general rule he is not responsible for their *torts*, he is not at the same time allowed to encourage or stimulate his slaves in their perpetration of a wrong. He could not command them to do more than the law would permit him to do, if acting himself in the matter.

If, on the other hand, the slaves acted merely under the general

order, or under any order which the master might legally give under the statute, and the casualty occurred while thus acting, the master is not responsible.    He was under no more obligation to be present and watch his slaves in the execution of a lawful order, than the plaintiffs were to keep their slave at home, whence he doubtless left without their knowledge, to visit the defendant's quarter.    The first wrong, if it can be so considered, was committed by the slave who ventured without permission upon the defendant's premises, and what was ordered to be done for the purpose of redressing this wrong, cannot be considered as an illegal act.

We deem it only necessary to state our conclusion on the point presented by the demurrer.

It is true as stated by counsel, that under the old rule of the common law, no action could be maintained against the party committing a felony until he had been convicted in a criminal proceeding.    But this rule, together with the reason upon which it was founded, has long since been exploded.    The conviction worked a forfeiture of the party's goods, and this was the reason why he was required to answer to the crown before he could answer to the person injured.    We are aware, however, that the old common law rule prevails in many of the states, but it has never been recognized in this state.

Judgment reversed, new trial granted, and cause remanded.